# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

SHEALA DAVIDSON,             )     CASE NO. 3:16CV2621

             )

      Plaintiff,       )     JUDGE JAMES CARR

             )

      v.           )     MAGISTRATE JUDGE

             )     JONATHAN D. GREENBERG

NANCY A. BERRYHILL,      )

     Acting Commissioner    )

     of Social Security,     )

            )     **REPORT AND**

      Defendant.     )     **RECOMMENDATION**

      Plaintiff, Sheala Davidson ("Plaintiff" or "Davidson"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be VACATED and the case REMANDED for further

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

1

consideration consistent with this decision.

# I. PROCEDURAL HISTORY

In June 2013, Davidson filed applications for POD, DIB, and SSI, alleging a disability onset date of April 1, 2012 and claiming she was disabled due to "restless leg syndrome, severe depression, anxiety/panic attacks, back injury pain, bilateral hip, leg pain/arthritis in hips, shoulder and neck pain, attention deficit hyperactivity disorder, nacrolepsy, bilateral carpel tunnel, migraine headaches, high blood pressure, gastric bypass surgery in 2001– causes vomiting, diabetes, heel spurs, and narrowing of the esophagus." (Transcript ("Tr.") 170, 404, 410, 450.) The applications were denied initially and upon reconsideration, and Davidson requested a hearing before an administrative law judge ("ALJ"). (Tr. 170, 327, 331, 340, 347.)

On July 22, 2015, an ALJ held a hearing, during which Davidson, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 196-241.) On September 2, 2015, the ALJ issued a written decision finding Davidson was not disabled. (Tr. 170-195.) The ALJ's decision became final on September 14, 2016, when the Appeals Council declined further review. (Tr. 1-7.)

On October 27, 2016, Davidson filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 15.) Davidson asserts the following assignments of error:

(1)    The ALJ's Residual Functional Capacity Assessment is not supported by substantial evidence.

(2)    Material New Evidence Warrants Remand.

(Doc. No. 13.)

# II. EVIDENCE

2

## A.  Personal and Vocational Evidence

Davidson was born in October 1960 and was fifty-four (54) years-old at the time of her administrative hearing, making her a "person closely approaching advanced age" under social security regulations.  (Tr. 185.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  She has a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as an inspector/hand packager (medium, SVP 2).  (Tr. 184.)

## B.  Relevant Medical Evidence[2]

In March 2012, Davidson presented to the emergency room ("ER") with complaints of headache, ankle swelling, chest pain, and nausea.  (Tr. 633-635.)  Examination revealed "2+ lower extremity edema which appears to be chronic."  (Tr. 634.)  Davidson did not have any tenderness in her calves, but she "mentioned having a trauma to the neck some 3 to 4 weeks ago and she was worried that she had a broken neck."  (*Id.*)  Davidson also complained of chronic blurry vision.  (*Id.*)

Among other testing, Davidson underwent x-rays of her cervical spine, which showed (1) mild C4-C5 and C6-C7 intervertebral disc space narrowing; (2) mild to moderate anterior endplate spurring at C6-C7 level; and (3) uncovertable joint spurring resulting in moderate left C6-C7 and mild right C6-C7 neural foraminal narrowing.  (Tr. 640.)  The ER physician diagnosed atypical chest pain, lower extremity edema, and venous insufficiency.  (Tr. 635.)

On September 6, 2012, Davidson presented to Tyson Sloan, M.D., at Family Health

---

[2]The Court's recitation of the evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Moreover, as Davidson's grounds for relief relate to her physical impairments only, the Court will limit its discussion of the evidence to that relating to her physical impairments.

Services of Erie County for treatment of shoulder pain with radiculopathy into her left arm, and right foot swelling.[3] (Tr. 656.) She reported a past medical history of hypertension, diabetes mellitus, depression, attention deficit disorder ("ADD"), and narcolepsy. (*Id*.) Examination revealed tenderness to palpation of Davidson's left vertebral gutter upper thoracic spine, and mild erythema and swelling of the top of her right foot. (Tr. 657.) Dr. Sloan assessed narcolepsy, somatic dysfunction- cervical, and localized superficial swelling. (Tr. 657.) He prescribed medication for Davidson's shoulder pain. (*Id.*)

Davidson returned to the ER on February 23, 2013 with complaints of chest pain "that goes up into her neck." (Tr. 641-647.) A chest x-ray and EKG were normal. (Tr. 642.) The ER physician diagnosed gastroesophageal reflux disease and anxiety, and discharged Davidson home. (Tr. 642-643.)

On June 7, 2013, Davidson presented to Nicholas Appleby, M.D., with complaints of restless leg symptoms. (Tr. 763-765.) On examination, Davidson had normal pulse, strength, sensation, and reflexes in all four extremities. (Tr. 763-764.) Dr. Appleby assessed narcolepsy, essential hypertension- benign, depressive disorder, menopausal and postmenopausal disorder, back pain, generalized anxiety disorder, restless leg syndrome, and iron deficiency anemia. (Tr. 764.) He refilled Davidson's medications (Adderall, Clonidine, Celexa, Estradiol, Vistaril, and Requip), ordered blood work, and advised Davidson to diet and exercise. (*Id*.)

On September 4, 2013, Davidson presented to Eric Mast, D.O., with multiple complaints including severe right hand pain and chronic neck and back pain. (Tr. 760-762.) With regard to

---

[3] Davidson also stated she had lost her Adderall in a rest station bathroom, and requested a refill of that medication for treatment of her narcolepsy and ADD. (Tr. 656.) Dr. Sloan advised Davidson that he could not refill her Adderall prescription. (Tr. 657.)

her right hand pain, Davidson stated she had been diagnosed with carpal tunnel "years ago via EMG," and had worn wrist splints at night for four years but had not worn them recently. (Tr. 760.) She complained of right hand pain, numbness, tingling and muscle weakness, stating the pain was worsening and she was "frequently dropping items." (*Id*.) With regard to her chronic lower back pain, Davidson indicated she had had a laminectomy "years ago" but continued to have chronic cervical and lumbar back pain that interfered with her activities of daily living. (*Id*.) She stated Tramadol had done "nothing for her pain" and requested Vicodin. (*Id*.)

On examination, Dr. Mast noted limited range of motion in all directions, but especially with bending and flexion/extension of the lumbar spine; pain to palpation of the lumbar spine; and no significant muscle spasms. (Tr. 761.) He also observed decreased muscle strength in Davidson's right hand with "significant thenar muscle wasting," and a positive Tinel's sign on the right hand. (*Id*.) Dr. Mast diagnosed carpal tunnel syndrome and back pain, and ordered an EMG and x-rays of Davidson's cervical and lumbar spines. (*Id*.)

Davidson underwent the x-rays on September 11, 2013. (Tr. 729, 731.) The cervical x-ray showed (1) mild disc narrowing at C3-C4; (2) moderate degenerative disc narrowing at C4-C5 with mild osteophytosis; and (3) moderate to significant disc narrowing at C6-C7 with moderate osteophytosis, progressed since prior study. (Tr. 729.) The lumbar x-ray showed (1) moderate degenerative disc narrowing at L4-L5 and L5-S1 with mild to moderate anterior osteophytosis and mild posterior osteophytosis; and (2) mild disc narrowing at L2-L3 and L3-L4 with mild anterior osteophytosis. (Tr. 731.)

Shortly thereafter, on September 24, 2013, Davidson underwent a bilateral nerve conduction study ("NCS") and EMG. (Tr. 732-733.) The NCS was normal bilaterally. (*Id*.)

The EMG, however, was abnormal and suggestive of (1) right ulnar neuropathy distal to the wrist (i.e., Guyon's Canal) with significant ongoing denervation; and (2) bilateral median neuropathies at/or distal to the wrist (i.e., Carpal Tunnel Syndrome) moderate in severity. (*Id*.) There was no evidence of right or left radial neuropathy, cervical radiculopathy, or brachial plexopathy. (*Id.*)

Davidson returned to Dr. Mast on September 26, 2013. (Tr. 757-759.) She complained of continued pain and weakness in both hands, stating "I have no strength in my hands." (Tr. 757.) Davidson also complained of continued back and neck pain. (*Id*.) She indicated she had fallen eight feet off a platform at work in 1997 and "has been having back and neck pain since that time." (*Id*.) Dr. Mast interpreted the x-rays as showing "significant disc narrowing and moderate osteophytosis of the cervical spine and mild to moderate spondylosis of the lumbar spine." (Tr. 757.) He interpreted the EMG as showing moderate carpal tunnel and severe right ulnar radiculopathy. (*Id*.)

On examination, Dr. Mast noted elevated blood pressure, crepitus in Davidson's cervical spine, and mildly limited range of motion, but no pain to palpation of either the cervical or lumbar spine or lower extremity edema. (Tr. 758.) He assessed essential hypertension-benign, carpal tunnel syndrome, and back pain. (*Id*.) Dr. Mast referred Davidson to an orthopedist for potential surgery, and prescribed Vicodin for back pain. (*Id*.)

On March 2, 2014, Davidson presented to neurologist Steven Benedict, M.D. (Tr. 787-789.) She complained of radicular pain and paresthesias into the upper extremities due to radiculopathy or plexopathy; and persistent neck and back pain. (Tr. 787.) Dr. Benedict ordered an EMG of Davidson's upper extremities "to assess for worsening nerve damage;" prescribed

Neurontin and Zanaflex; and referred her for a surgical consult for right ulnar nerve transposition and carpal tunnel release. (*Id.*)

Davidson underwent an NCS and EMG on March 18, 2014. (Tr. 782-783.) The NCS was normal. (*Id.*) With regard to the EMG, the report states that "extensive EMG of the upper extremities reveals prolongation of the median nerve palmar sensory latency when compared to the ipsilateral ulnar nerve palmar latency on the left." (Tr. 783.) The report indicates this was consistent with "a median neuropathy at or distal to the wrist, such as in carpal tunnel syndrome, which is minimal in degree electrically on the left." (*Id.*) There was no evidence of cervical motor radiculopathy or brachial plexopathy. (*Id.*)

The following day, Davidson presented to Azedine Medkhour, M.D., for evaluation of right hand and arm numbness. (Tr. 797.) Davidson reported severe back and neck pain, which she rated an 8-9 on a scale of 10. (*Id.*) She also indicated she had been assaulted in November 2013 and had "multiple hits to the head." (*Id.*) On examination, Dr. Medkhour noted as follows:

> On exam today, she is awake, alert, oriented x3. Memory is good. Speech is clear. CN's II-XII unremarkable. Cerebellar testing is negative. Gait including heel to toe was within normal. Sensory exam disclosed decreased sensation of C7 on the right, C8-T1. Toes are downgoing, but Hoffmann was positive bilaterally. Inspection disclosed wasting of the first dorsal intraosseous muscle in the right hand. Palpation of the cervical, thoracic and lumbar elicited pain, worse at the cervical and lumbar spine. Bending forward and laterally of the cervical spine was painful. Deep tendon reflexes were 2+ throughout.

(*Id.*) He also noted positive Tinel's and indicated "the EMG confirmed anomaly at ulnar and carpal tunnels, worse on the right side for the ulnar." (*Id.*) Dr. Medkhour ordered an MRI of Davidson's cervical and lumbar spines. (*Id.*)

On April 2, 2014, Davidson presented to Thomas A. Olexa, M.D., for consultation regarding her right hand pain. (Tr. 811-812.) Davidson reported pain, numbness, and tingling in

her right hand. (*Id.*) She stated she "has been having hand numbness for years, getting worse, has noted some muscular atrophy." (*Id.*) On examination, Dr. Olexa noted positive Tinel's over the carpal tunnel and positive Phalen's at 10 seconds. (*Id.*) He indicated "EMG shows evidence of carpal tunnel and ulnar nerve involvement" and scheduled Davidson for a right carpal tunnel release. (*Id.*) Dr. Olexa also noted "potentially complex problem, we will plan carpal tunnel and see how she does. Pain symptoms not typical of carpal tunnel." (*Id.*)

The record reflects Davidson underwent a right carpal tunnel release on May 8, 2014. (Tr. 805, 1097.)

On May 14, 2014, Davidson underwent imaging of her cervical and lumbar spines. (Tr. 848-849.) The cervical x-ray showed "stable degenerative changes," including (1) stable mild disc space narrowing of the C4-C5 and C5-C6; (2) stable mild to moderate disc space at C6-C7; (3) endplate degenerative changes with anterior spurring from C4 -C7; (4) mild uncovertebral degenerative changes; and (5) mild neuroforaminal narrowing of C6-C7 bilaterally. (Tr. 848.) The lumbar x-ray showed (1) minimal grade 1 retrolisthesis of L3-L4 of about 2.6 mm; (2) mild disc space narrowing of L3-L5; (3) anterior and posterior endplate spurring; and (4) mild facet hypertrophic changes of the lower lumbar spine. (Tr. 849.)

Davidson returned to Dr. Benedict on May 19, 2014. (Tr. 1097-1101.) She was "crying and tearful complaining of difficulty with her cognition" since she suffered a head injury after being assaulted by her sister. (Tr. 1097.) Davidson also complained of persistent and constant back pain, muscle spasm, as well as leg pain, numbness, and tingling. (Tr. 1098.) She also indicated that, despite the surgery, she still felt pain and numbness in her right hand. (*Id.*) On examination, Dr. Benedict noted normal gait, negative straight leg raise bilaterally, and 5/5

8

bilateral wrist extension. (Tr. 1099.) He diagnosed degenerative disc disease– lumbar spine, and paresthesias to bilateral upper extremities due to neuropathy. (*Id*.) Dr. Benedict ordered an EMG of Davidson's bilateral lower extremities; increased her medication; and ordered an MRI of her brain. (Tr. 1100.) He also recommended physical therapy, but Davidson declined. (*Id.*)

Davidson returned to Dr. Olexa on June 4, 2014 for evaluation of her right hand status post carpal tunnel release surgery. (Tr. 949.) She complained of continued numbness in her hand, and stated "symptoms are worse now than prior to surgery." (*Id*.) On examination, Dr. Olexa noted muscle atrophy in Davidson's dorsal hand. (*Id*.) He indicated Davidson's condition "appears to be more complex situation" and found she "will need more extensive workup." (*Id.*) He prescribed Ultracet and referred her to a hand specialist. (*Id*.)

On July 24, 2014, Davidson presented to Dr. Benedict with complaints of cervical pain. (Tr. 1075-1078.) She reported back pain, joint pain, swelling, muscle cramps, muscle weakness, stiffness, and paresthesia; and rated her pain a 6 on a scale of 10. (Tr. 1075-1076.) Dr. Benedict's notes indicate Davidson had undergone a right ulnar release surgery earlier that month, and had improved symptoms. (Tr. 1077.) He ordered a EMG of her lower extremities and adjusted her medications. (*Id*.) On August 12, 2014, Davidson underwent a NCS and EMG of her bilateral lower extremities, both of which were essentially normal. (Tr. 1079-1080.)

Davidson presented to Jacqueline Graziani, M.D., on September 2, 2014. (Tr. 1089-1093.) She complained of headache, back pain, joint pain, muscle weakness, stiffness, and paresesthasias. (Tr. 1090.) With regard to her lumbar pain, Dr. Graziani noted Davidson's right lower extremity paresthesias was without known etiology and indicated that "[a]nother consideration could be a small fiber neuropathy." (Tr. 1091.) Dr. Graziani also found Davidson

9

"would benefit from trial of lumbar epidural injection due to continued intractable lumbar pain." (Tr. 1092.) She adjusted Davidson's medications, ordered epidural lumbar injections, and referred her for Quantitative Sudomotor Autonomic Reflex Testing ("QSART") in order "to rule out small fiber neuropathy." (*Id*.) Davidson subsequently underwent the QSART testing, which was abnormal and corresponded to "a severely abnormal postganglionic sympathetic sudomotor axon and sweat gland function." (Tr. 1087.)

On October 1, 2014, Davidson presented to Robert Musson, M.D., with complaints of moderate to severe pain in her lower extremities. (Tr. 1230-1234.) She reported "aching, being awakened at night, bulging, burning, cramping, difficulty healing wounds, fatigue, heaviness, numbness, pain, restless legs, swelling, tenderness, throbbing, Varicose veins, spider veins, and skin discoloration." (Tr. 1230.) On examination, Dr. Musson noted the presence of spider veins and varicose veins, as well as edema in her left ankle. (Tr. 1233.) He assessed limb pain, venous insufficiency, and varicose veins of lower extremities with complications. (Tr. 1234.) Dr. Musson prescribed compression stockings, and advised Davidson to use pain medication, elevate her legs, and walk. (*Id*.)

Several weeks later, on October 29, 2014, Davidson presented to Amy D. Browne, D.O. (Tr. 1067-1070.) She had no current complaints, and physical examination findings were normal. (*Id*.)

On November 4, 2014, Davidson returned to Dr. Graziani for follow up regarding her lumbar pain and radiculopathy. (Tr. 1081-1085.) She complained of increasing lower back pain, as well as joint pain, and paresthesias to the bilateral lower extremities. (Tr. 1082.) Dr. Graziani indicated Davidson's QSART testing was abnormal and concluded Davidson's paresthesias "was

most consistent with a neuropathy." (Tr. 1084.) She ordered an MRI of Davidson's lumbar spine and referred her for a functional capacity evaluation and physical therapy. (*Id*.)

Davidson underwent a lumbar MRI on November 19, 2014, which revealed multilevel degenerative disc disease with small regions of associated disc protrusion. (Tr. 1017-1018.) Specifically, the MRI showed (1) mild disc space narrowing and a 11 x 3 mm left paracentral focal disc protrusion at L2-L3 which abuts and slightly deforms the anterior aspect of the thecal sac; (2) disc space narrowing and disc dehydration at L3-L4 with a diffuse bulge of the annulus, approximately 5 x 2 mm central associated disc protrusion, and possible tiny annular tear; (3) disc space narrowing and disc dehydration at L4-L5, with diffuse slightly assymetrical bulge with minimal decreased signal and superimposed broad-based 15 x 2.5mm disc protrusion; and (4) right hemilaminectomy at L5-S1 with a broad-based, moderate sized 23 x 3 mm disc protrusion centrally and to the right which abuts and minimally posteriorly displaces the right S1 root and with mild associated narrowing of the right neural exit foramina. (*Id*.)

On January 27, 2015, Davidson presented to certified nurse practitioner Diana Rodriguez, C.N.P., for follow up regarding her lumbar pain and radiculopathy. (Tr. 1189-1193.) Davidson complained of chronic low back and cervical pain, weakness in her bilateral lower extremities, and numbness and tingling in her hands. (Tr. 1189.) She rated her pain an 8 on a scale of 10, despite the fact she was taking 8 or more Tramadol per day. (Tr. 1189-1190.) Davidson reported intermittent radicular pain in her right leg, and stated the pain was interfering in her day to day activities. (Tr. 1190.) She also reported intermittent paresthesia to her hands, which was increasing in frequency, waking her from sleep, and causing her to drop things on occasion. (Tr. 1191.) Examination revealed paraspinal tenderness to Davidson's lower back and cervical spine

and normal gait. (Tr. 1191.) Nurse Rodriguez started Norco and Lidoderm, increased the Elavil dosage, continued Flexeril, and referred Davidson to physical therapy. (Tr. 1192.)

On March 17, 2015, Davidson presented to Paul C. Laffay, D.O., for evaluation of anemia and complaints of vomiting and abdominal discomfort. (Tr. 1139-1140.) She reported vomiting up to seven times per week. (*Id.*) Physical examination findings were normal, including normal motor strength in her upper and lower extremities. (Tr. 1140.) Dr. Laffay referred Davidson for a colonoscopy. (*Id.*)

On March 26, 2015, Davidson presented to Pam Evans, P.T., for a Physical Therapy Initial Evaluation. (Tr. 1148-1149.) Davidson complained of centralized low back pain throughout her lumbar spine radiating to the bilateral greater trochanteric area. (*Id.*) She reported her symptoms had been chronic since 1997 and interfered with carrying and dressing, grooming, lifting, reaching, recreational interests, sitting, squatting, standing, stooping, using stairs and walking. (*Id.*) Davidson rated her pain a 7-8 on a scale of 10. (*Id.*) Examination revealed decreased range of motion in Davidson's lumbar spine; positive straight leg raise bilaterally; normal gait; and "weakness right lower extremity graded at 3.5/5 for hip flexion, abduction, adduction, quadriceps, hamstrings." (*Id.*) It appears Davidson attended five physical therapy sessions between March and May 2015. (Tr. 1147, 1204.)

On April 30, 2015, Davidson again complained of back pain, intermittent radicular pain in her right leg, occasional leg weakness, intermittent paresthesia to her hands, hand weakness, neck pain and stiffness, and limited neck range of motion. (Tr. 1197-1198.) She stated she dropped things on occasion, and that her pain interfered with her day to day activities. (*Id.*) Examination revealed paraspinal tenderness to Davidson's lower back and cervical spine;

decreased sensation to bilateral pin prick in Davidson's upper extremities; normal gait; negative straight leg raise bilaterally; and 5/5 wrist extension bilaterally. (Tr. 1199.) Davidson was scheduled for a lumbar epidural "due to intractable pain not controlled by medications and physical therapy." (Tr. 1200.) Davidson underwent a lumbar epidural nerve block in June 2015. (Tr. 1281-1283.)

On July 21, 2015, Davidson underwent an MRI of her cervical spine, which revealed "multilevel cervical spondylosis resulting in canal narrowing at C4-C5 through C6-C7 and foraminal narrowing at C3-C4 through C6-C7." (Tr. 1268.) Specifically, the MRI showed the following: (1) reactive/mechanical and/or degenerative endplate edema at C5-C6; (2) multilevel osteophytes and disc desiccation throughout the cervical spine and multilevel disc height loss which is most pronounced at C5-C6 and C6-C7; (3) osseous spurring at C3-C4 with moderate narrowing of the left foramen; (4) diffuse disc bulging and osseous spurring at C4-C5 with moderate foraminal narrowing; (5) disc bulge/osteophyte complex at C5-C6 with severe foraminal narrowing; and (6) disc bulge/osteophyte complex at C6-C7 with severe foraminal narrowing. (*Id*.)

## C.    Relevant State Agency Reports

On July 22, 2013, state agency physician Dimitri Teague, M.D., reviewed Davidson's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 259-261.) Dr. Teague concluded Davidson could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of about 6 hours in an 8 hour workday; and sit for a total of about six hours in an 8 hour workday. (Tr. 259.) He found Davidson had an unlimited capacity to push/pull and balance; could frequently climb ramps and stairs; and could

occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds.  (Tr. 259-260.)

Dr. Teague determined Davidson had no manipulative limitations.  (Tr. 260.)  Lastly, he

concluded Davidson should avoid even moderate exposure to hazards (i.e., commercial driving,

moving machinery, and unprotected heights) due to her narcolepsy.  (*Id.*)

On May 27, 2014, state agency physician Stephen Sutherland, M.D., reviewed

Davidson's medical records and completed a Physical RFC Assessment.  (Tr. 299-300.)  He

found Davidson had no exertional (lifting, carrying, walking, standing, sitting, pushing or

pulling) or non-exertional (postural, manipulative, visual, communicative, or environmental)

limitations.  (Tr. 299.)  He explained as follows:

> [Claimant] has had multiple doctor visits for various pain and other health
> concerns.  Her exams have been essentially normal.  She had a carpal tunnel
> release on her Rt wrist 5/8/14.  Assuming she will fully heal from this surgery,
> she is not expected to have any severe residual functional limitations.

(Tr. 299.)

Meanwhile, on May 14, 2014, Davidson underwent a consultative physical examination

with Marsha Cooper, M.D.  (Tr. 839-846.)  Davidson complained of "back pain at times, but no

radicular pain."  (Tr. 844.)  On examination, Dr. Cooper noted normal gait, negative straight leg

raise, no edema, normal pedal pulses, equal and symmetric deep tendon reflexes, normal right

and left hand grips, normal manual dexterity, normal balance, and normal Rhomberg and

Babinski.  (Tr. 845.)  Manual muscle and range of motion testing of Davidson's shoulders,

elbows, wrists and hands/fingers was normal, despite the fact Davidson recently had carpal

tunnel surgery and was wearing a wrist splint on her right hand.  (Tr. 839-842.)  Range of motion

testing of Davidson's dorsolumbar spine, hips, knees, and ankles was also normal.  (Tr. 841-

842.)  Dr. Cooper concluded as follows:

This 53-year-old female looks to be in fairly good shape. * * * She is claiming that she is applying for problems with depression, but she also states she has some pain in her back.

X-rays have been received and reviewed. The Cspine reported no acute bony abnormalities and stable degenerative changes. The lumbar spine showed degenerative changes and minimal, grade 1 retrolisthesis of L3 on L4.

Based on this exam, the claimant is functional. She has no issues with walking or going up stairs. She can sit and stand for any length of time without any limitations. She has normal manual dexterity and intellect.

(Tr. 846.)

## D.     Hearing Testimony

During the July 2015 hearing, Davidson testified to the following:

- She lives in a one story house with a friend. (Tr. 202-203, 220.) She has a drivers' license and generally drives every day, usually to visit her mother. (*Id*.) She completed the twelfth grade and is able to manage her own finances. (Tr. 204.)

- She has not worked since April 2012. (Tr. 204.) Prior to that, she worked in an automotive plant for 16 years. (Tr. 206.) For six of those years, she worked as a production operator and was required to lift 30 to 40 pounds throughout the day. (*Id*.) In 1997, however, she injured her back in a workplace accident and subsequently underwent surgery for a herniated disc. (*Id*.) She then worked in quality control, where she was also required to routinely lift 30 to 40 pounds. (*Id*.) She also has prior work experience as a gluer. (Tr. 205.)

- She can no longer work because of constant neck and back pain. (Tr. 207, 231.) Her neck "throbs all the time," which interferes with her sleep and causes her to experience numbness/tingling in her hands. (Tr. 222.) Her legs ache and are weak, making it difficult for her to stand and walk. (Tr. 207, 220.) She has poor circulation in her legs and is going to have to have surgery on both of her legs. (Tr. 221.) She takes Norco and Lidocaine patches for her pain. (Tr. 209.)

- She also suffers from bilateral carpal tunnel syndrome. (Tr. 224-225.) She has had two surgeries on her right hand. (*Id*.) She experiences numbness and tingling in her hands, causing her to "drop everything." (Tr. 219, 222.)

- She was struck in the head in October 2013 by her sister, after which she had trouble speaking. (Tr. 224.) An MRI of her brain in June 2014 revealed a

"spot." (Tr. 223.)  She was told there was evidence of a remote stroke. (Tr. 210-211, 223-224.)

- She can walk for one quarter of a mile; stand for 15 minutes; and sit for 30 minutes before needing to get up.  (Tr. 219.) She cannot push or pull with her arms or legs.  (*Id*.)  She can lift a gallon of milk, but could not carry it continually.  (*Id*.)  She cannot bend, squat, crawl, or climb stairs.  (*Id*.)  She cannot reach overhead or in all directions.  (*Id*.)  She cannot use her hands or fingers due to numbness/tingling in her hands.  (*Id*.)

- She also suffers from severe depression, anxiety, panic attacks, ADHD, and narcolepsy.  (Tr. 207, 209-210, 226-227.)  She has been treated for depression since her father committed suicide in the 1980's.  (Tr. 226.)  She has been seeing a psychiatrist since 2013.  (Tr. 232.)  She experiences panic attacks two to three times per week, with each panic attack lasting approximately 30 minutes.  (Tr. 227.)

- She takes Effexor, Abilify, Buspar, and Adderrall for her mental conditions.  (Tr. 209-210, 226.)  When questioned by the ALJ about repeated references in the record to Adderall misuse, she denied any drug seeking behavior or misuse of any of her prescriptions.  (Tr. 213-214, 217, 228-229.)  She did acknowledge that she took an extra Vicodin once because her back hurt "really bad," but stated the emergency room doctor told her to do so. (Tr. 229.)  She indicated she has given her Adderall to other people to use, but has never sold it to anyone.  (Tr. 228.)

- She tries to do some chores.  (Tr. 220.)  She is able to do the laundry and wash dishes.  (*Id*.)  She does not grocery shop.  (*Id.*)

The VE testified Davidson had past work as an inspector/packager (medium, SVP 2).

(Tr. 234.)  The ALJ then posed the following hypothetical question:

 I'm going to ask you several hypothetical questions.  The first is to please assume the claimant has the residual functional capacity for medium work, meaning she can lift 50 pounds occasionally, 25 pounds frequently, carry 50 pounds occasionally and 25 pounds frequently, and she can sit for six hours in an eight-hour day, stand for six hours in an eight-hour day, and walk for six hours in an eight-hour day.  She can also push and pull as much as she can lift and carry, she can frequently use her right and left hand and foot controls, frequently reach overhead and in all other directions, and frequently handle, finger, and feel with the bilateral upper extremities.  She can climb ramps and stairs frequently, can never climb ladders, ropes or scaffolds, and can frequently balance, stoop, kneel, crouch and crawl.  She can never work at unprotected

16

> heights or around moving mechanical parts.  She is limited to simple, routine
> and repetitive tasks, but not at a production rate pace, for example no assembly
> line work.  She can frequently respond appropriately to supervisors, coworkers
> and the general public, and as far as dealing with changes in the work setting is
> concerned, she is limited to simple work-related decisions.

(Tr. 234-235.)

The VE testified the hypothetical individual would be able to perform Davidson's past work as an inspector/packager and, further, would also be able to perform other representative jobs in the economy, such as a stores laborer (medium, SVP 2), floor waxer (medium, SVP 2), and retail bagger (medium, SVP 2).  (Tr. 235-236.)

The ALJ then asked a second hypothetical that was the same as the first, but changed the exertional level from medium to light.  (Tr. 236.) The VE testified such a hypothetical individual would not be able to perform Davidson's past relevant work but would be able to perform other representative jobs in the economy, such as housekeeping cleaner (light, SVP 2), laundry folder (light, SVP 2), and office helper (light, SVP 2).  (Tr. 236-237.)

Davidson's attorney then asked the VE to assume the hypothetical individual at the light work level with the further limitation that the individual could only sit for an hour at a time and could only stand for about 20 minutes at a time.  (Tr. 238.)  The VE testified "that would not be in the light range."  (*Id.*)

Davidson's attorney next asked the VE to assume the hypothetical individual at the light work level with the following additional manipulative limitations:

Q:	So, they would have, fingering would be limited to occasional.

A:	With regard to the previous occupations I've identified, beginning
	with the housekeeping cleaner, fingering is occasional.  Are there any
	other limitations?

Q:      What about gripping, if you were a house cleaner and you were only
        able or you only had 20% grip strength in your hands?

                * * *

ALJ:    Okay.  Can you rephrase it? In other words, you've phrased it in terms
        of degree of strength, which is not consistent with the DOT.  Can you
        rephrase it in a way that will address the vocational limitation
        consistent with the DOT?

Q:      Well, gripping or gross manipulation only occasionally.

A:      If that is the case, then the occupations I previously identified cannot
        be performed under the Judge's hypothetical.

(Tr. 239.)  The VE further testified the individual could perform the identified jobs with the

additional limitation to occasional pushing and pulling at the light level.  (Tr. 239-240.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when

she became disabled; and (3) she filed while she was disabled or within twelve months of the

date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905;

*Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits,

a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and

416.1201.

18

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Davidson was insured on her alleged disability onset date, April 1, 2012 and remained insured through June 30, 2015, her date last insured ("DLI.") (Tr. 170.) Therefore, in order to be entitled to POD and DIB, Davidson must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period

precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2015.

2.  The claimant has not engaged in substantial gainful activity since April 1, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: cervical and lumbar degenerative disc disease; carpal tunnel syndrome and right ulnar neuropathy, status post-surgical release; gastroesophageal reflux disease (GERD); left groin abscess/cellulitis; prescription drug abuse (Vicodin and Adderall); depression; and anxiety.  (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.)

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work, meaning that she can lift 50 pounds occasionally, and 25 pounds frequently, carry 50 pounds occasionally and 25 pounds frequently, and can sit for six hours in an eight hour workday, stand for six hours in an eight hour workday, and walk for six hours in an eight hour workday.  She can also push and pull as much as she can lift and carry.  In addition, she can frequently use right and left hand and foot controls, frequently reach overhead and in all other directions, and frequently handle, finger and feel with the bilateral upper extremities.  She can climb ramps and stairs frequently, but can never climb ladders, ropes or scaffolds, and can frequently balance, stoop, kneel, crouch and crawl.  She can never work at unprotected heights, or around moving mechanical parts.  Finally, she is limited to simple, routine and repetitive tasks but not at a production rate pace (e.g. assembly line work); and can frequently respond appropriately to supervisors, coworkers, and the general public; and as far as dealing with changes in the work setting are concerned, she is limited to simple, work-related decisions.

6.  The claimant is capable of performing past relevant work as an

Inspector/Hand Packager. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 419.965).

7. The claimant has been under a disability, as defined in the Social Security Act, from April 1, 2012, through the date of the decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 170-186.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of*

21

*Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI. ANALYSIS

*RFC*

Davidson argues the ALJ's RFC assessment is not supported by substantial evidence. (Doc. No. 13.) She maintains "once appropriate weight is given to the objective medical evidence, substantial evidence proves that Ms. Davidson cannot perform the standing, walking and lifting required of medium work." (*Id.* at 10.) Specifically, Davidson argues the ALJ improperly failed to credit evidence of worsening neck, back and hand pain, citing treatment notes from Drs. Benedict and Medkhour and objective test results including the two abnormal EMGs, the QSART, and imaging of her cervical and lumbar spines. (*Id.* at 11-12.) Lastly, Davidson maintains the ALJ selectively evaluated the medical evidence in formulating the RFC and, further, exceeded his expertise in weighing the opinion evidence.

The Commissioner argues substantial evidence supports the RFC. (Doc. No. 15 at 8.) She maintains the ALJ "thoughtfully and extensively addressed the medical evidence and opinions," and the longitudinal evidence in the record supports the limitation to a reduced range of medium work. (*Id.*) The Commissioner also emphasizes that "[w]hile Plaintiff contends that the evidence supports a limitation for only occasional use of the hands, bilaterally, she has pointed to no medical opinion that is consistent with such an extreme limitation." (*Id.* at 9.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for

assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and

must consider all of a claimant's medically determinable impairments, both individually and in

combination, <u>S.S.R. 96-8p</u>.

"In rendering his RFC decision, the ALJ must give some indication of the evidence

upon which he is relying, and he may not ignore evidence that does not support his decision,

especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774

F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010)

("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual

functional capacity determination,' and must also 'mention or refute [...] contradictory, objective

medical evidence' presented to him.")). *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20

("The RFC assessment must always consider and address medical source opinions. If the RFC

assessment conflicts with an opinion from a medical source, the adjudicator must explain why

the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well

established that the claimant bears the burden of establishing the impairments that determine his

RFC. *See Her*, 203 F.3d at 391.

Here, at step two, the ALJ determined Davidson suffered from the severe impairments

of cervical and lumbar degenerative disc disease; carpal tunnel syndrome and right ulnar

neuropathy, status post-surgical release; GERD; left groin abscess/cellulitis; prescription drug

abuse; depression; and anxiety. (Tr. 172.) After determining Davidson's impairments did not

meet or equal a listing, the ALJ proceeded at step four to consider the medical and opinion

evidence regarding her physical impairments. (Tr. 177-181.) The ALJ first recited the results of

the various imaging studies of Davidson's cervical and lumbar spines. (Tr. 178.) The ALJ then

found Davidson's physicians "sporadically prescribed her medications," but noted the EMG of her lower extremities was normal and asserts that, although Davidson was advised to continue physical therapy and undergo epidural steroid injections, "no further treatment is noted of record." (*Id*.) The ALJ's discussion of Davidson's treatment records for her neck, back and hand pain as follows:

> It is further noted that despite the claimant's reports of ongoing chronic neck and back pain, at the consultative examination in May 2014, the claimant was observed to have normal gait, normal balance and dexterity, and normal handgrips. (23F). It was again observed in October 2014, by a treating clinic, that the claimant had normal gait. (48F/23). Further, a physical examination performed by one of claimant's treating physicians on October 29, 2014 revealed that the claimant had normal range of motion in her spine, no spinal tenderness, and normal range of motion in all extremities. (34F/34). Further, at a consultation for anemia on March 17, 2015, the claimant was again observed to have a normal spine with no vertebral tenderness noted and was also noted to have normal strength in her upper and lower extremities. (37F/28-29). In addition, in March 2015, the claimant rep1ied that she was exercising regularly (39F/ 1).

> In addition to her above impairments, the claimant's record also supports that an EMG of her upper extremities performed in September 2013 revealed evidence of a right ulnar neuropathy to the distal wrist and evidence of bilateral carpal tunnel syndrome (CTS) of moderate severity. (12F/2). However, a subsequent EMG performed in March 2014 revealed evidence that supported a median neuropathy (CTS) of only a minimal degree. (18F, 19F, and 36F/2). For treatment of these conditions, on May 8, 2014, the claimant underwent a carpal tunnel release surgery on her right upper extremity. (21F/l). It is also noted that she was prescribed braces to wear for her carpal tunnel syndrome in May 2014. (28F). In addition, in July 2014, the record reflects that the claimant underwent a right ulnar release procedure. (36F/2). Following this treatment in July 2014, no further treatment is noted for her carpal tunnel syndrome throughout the adjudicated period.

(*Id*.)

The ALJ then considered the opinion evidence, noting "the claimant's treating physicians did not provide medical opinions in the record." (Tr. 179.) The ALJ assigned "some

weight" to the opinion of consultative examiner Dr. Cooper, stating her "overall findings are consistent with the claimant's record at the time of assessment" but "based on later submitted evidence (34F -50F), the undersigned has assessed greater exertional, postural, manipulative, and environmental limitations." (*Id.*) The ALJ then assigned "little weight" to the opinions of both Dr. Teague and Dr. Sutherland. (*Id.*) He found Dr. Teague's determination that Davidson was limited to light work "is inconsistent with the claimant's consistently noted normal physical examinations of record." (*Id.*) The ALJ concluded Dr. Sutherland's opinion that Davidson had no physical limitations was not supported by evidence documenting the existence of multiple severe physical medically determinable impairments. (*Id.*)

The ALJ then formulated the following physical limitations in the RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work, meaning that she can lift 50 pounds occasionally, and 25 pounds frequently, carry 50 pounds occasionally and 25 pounds frequently, and can sit for six hours in an eight hour workday, stand for six hours in an eight hour workday, and walk for six hours in an eight hour workday. She can also push and pull as much as she can lift and carry. In addition, she can frequently use right and left hand and foot controls, frequently reach overhead and in all other directions, and frequently handle, finger and feel with the bilateral upper extremities. She can climb ramps and stairs frequently, but can never climb ladders, ropes or scaffolds, and can frequently balance, stoop, kneel, crouch and crawl. She can never work at unprotected heights, or around moving mechanical parts.

(Tr. 176.)

Upon careful review, the Court finds the physical limitations in the RFC are not supported by substantial evidence. In discussing the medical record regarding Davidson's treatment for chronic neck, back and hand pain, the ALJ notes consultative examiner Dr. Cooper's normal examination findings and cites four specific treatment notes in which

26

Davidson is observed to have normal gait, normal range of motion, normal extremity strength, and no spinal tenderness.  (Tr. 178.)  Later in the opinion, the ALJ characterizes Davidson's physicians as "consistently not[ing] normal physical examinations of record. " (Tr. 179.)  In fact, the record reflects numerous occasions during which Davidson's physicians noted abnormal physical examination findings during the relevant time period, including the following:

- In September 2013, Dr. Mast noted limited range of motion in all directions but especially with bending and flexion/extension of the lumbar spine; pain to palpation of the lumbar spine; crepitus of the cervical spine, decreased muscle strength in Davidson's right hand with "significant thenar muscle wasting," and a positive Tinel's sign on the right hand.  (Tr. 758, 761.)

- In March 2014, Dr. Medkhour noted decreased sensation of C7 on the right and C-8 through T-1; positive Hoffman; right hand muscle wasting; pain to palpation of cervical and lumbar spines; and positive Tinel's.  (Tr. 797.)

- In April 2014, Dr. Olexa noted positive Tinel's over Davidson's right hand carpal tunnel and positive Phalen's at 10 seconds.  (Tr. 811-812.)

- In June 2014 (after Davidson's first carpal tunnel surgery), Dr. Olexa noted muscle atrophy in her right hand and indicated her condition "appears to be [a] more complex situation" and referred her for a "more extensive workup." (Tr. 949.)

- In November 2014, Dr. Graziana noted QSART testing of Davidson's lower extremities was abnormal and concluded her paresthesias was "most consistent with a [small fiber] neuropathy."  (Tr. 1084.)

- In January 2015, Certified Nurse Practitioner Rodriguez noted paraspinal tenderness to Davidson's lower back and cervical spine. (Tr. 1191.)

- In March 2015, physical therapist Evans noted decreased range of motion in Davidson's lumbar spine; positive straight leg raise bilaterally; and "weakness right lower extremity graded at 3.5/5 for

hip flexion, abduction, adduction, quadriceps, [and] hamstrings." (Tr. 1148-1149.)

- In April 2015, examination revealed paraspinal tenderness to Davidson's lower back and cervical spine, and decreased sensation to pin prick in Davidson's bilateral upper extremities. (Tr. 1199.)

The ALJ fails, at any point in the decision, to acknowledge or address any of these abnormal findings, and instead cites only those examination findings that support his physical RFC assessment.[4] As discussed above, an ALJ "may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp.2d at 880 (citing *Bryan*, 383 Fed. Appx. at 148) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 Fed. Appx. 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"*); Hobson v. Berryhill,* 2017 WL 3237788 at * 6 (M.D. Tenn. July 31, 2017) ("The Sixth Circuit has also made clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record or by selectively parsing that record—i.e., 'cherry-picking' it—to avoid analyzing all of the relevant evidence."); *Vrabel v. Comm'r of Soc. Sec.*, 2015 WL 5244358 at *

---

[4] The ALJ also incorrectly states that, while continued physical therapy and epidural steroid injections were recommended in April 2015 for Davidson's ongoing neck and back pain, "no further treatment is noted of record." (Tr. 178.) The record reflects, however, that Davidson underwent a lumbar epidural nerve block in June 2015. (Tr. 1281-1283.)

8 (E.D. Mich. Sept. 8, 2015) (same). Here, the ALJ fails to acknowledge the presence of the numerous abnormal examination findings in the record, making no attempt to resolve the inconsistencies between these findings and the specific normal findings cited in the decision. This "selective parsing" of the record is not appropriate under the authority noted above.

The ALJ similarly fails to fairly characterize the record with regard to Davidson's bilateral hand pain and weakness. The ALJ acknowledges Davidson underwent two surgeries on her right hand (in May and July 2014) and was prescribed wrist braces for her carpal tunnel. (Tr. 178.) The ALJ then states " following this treatment in July 2014, no further treatment is noted for her carpal tunnel syndrome throughout the adjudicated period." (*Id.*) The record reflects, however, that Davidson repeatedly complained of progressively worsening paresthesia and weakness in her bilateral hands subsequent to her July 2014 right hand surgery. Specifically, in January 2015, Davidson complained of numbness and tingling in her hands, stating it was increasing in frequency, waking her from her sleep, and causing her to occasionally drop things. (Tr. 1189-1191.). Certified Nurse Practitioner Rodriguez adjusted her medications. (Tr. 1192.) Several months later, in April 2015, Davison again reported intermittent paresthesia and weakness in her bilateral hands. (Tr. 1198.) Examination revealed decreased sensation to pin prick in her bilateral upper extremities.[5] (Tr. 1199.) The ALJ does not acknowledge or address this evidence in the decision, which is particularly significant given the VE's testimony that Davidson would not be able to perform the identified jobs if the hypothetical individual was limited to occasional gross manipulation. (Tr. 239.)

---

[5] As discussed *infra* in connection with Davidson's second assignment of error, in October 2015 (after the ALJ issued his decision), Davidson underwent carpal tunnel release surgery on her left hand. (Tr. 106.)

The Commissioner argues remand is not required because there is "no medical opinion in the record that supports her contention that she could not perform at the RFC level set forth by the ALJ." (Doc. No. 15 at 10.) This argument is without merit. The absence of a treating physician opinion does not, in and of itself, excuse an ALJ's failure to acknowledge significant medical evidence in the record when fashioning the RFC, particularly where that evidence is contradictory to the RFC determination. *See* SSR 96-8p, 1996 WL 374184 at * 7 (July 2, 1996) (In fashioning the RFC, an ALJ must consider the medical and other relevant evidence and "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.").

Moreover, the Court finds the opinion evidence before the ALJ in the instant case is not sufficient to overcome his failure to acknowledge the medical evidence noted above. As discussed *supra*, there are three medical opinions in the record regarding Davidson's physical functional limitations: (1) Dr. Teague's July 2013 opinion Davidson was limited to a reduced range of light work (i.e. she could lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and/or walk for a total of about 6 hours each; occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds, and had no manipulative limitations) (Tr. 259-260); (2) Dr. Cooper's May 2014 opinion Davidson had "no issues with walking or going up stairs," "can sit and stand for any length of time without limitations," and "has normal manual dexterity," (Doc. No. 846.); and (3) Dr. Sutherland's May 2014 opinion Davidson had no physical functional limitations of any kind "assuming she will fully heal from [her May 2014 carpal tunnel] surgery." (Tr. 299-300.) Each of these three opinions was authored prior to treatment records and objective medical evidence suggesting a worsening of Davidson's physical

impairments. Specifically, these opinions were rendered before Davidson (1) underwent a second surgery on her right hand in July 2014 and thereafter continued to complain of bilateral hand paresthesias and weakness in January and April 2015 (Tr. 1077, 1189-1193, 1197-1198); (2) underwent QSART testing that was severely abnormal and suggestive of small fiber neuropathy in her bilateral lower extremities (Tr. 1087); and (3) underwent an MRI of her cervical spine in July 2015 which revealed diffuse disc bulging and severe foraminal narrowing at C5-C6 and C6-C7 (Tr. 1268.) While the ALJ acknowledged some of this evidence,[6] he did not sufficiently articulate how it impacted either his weighing of the opinion evidence and/or his formulation of the physical limitations in the RFC.[7]

Although an ALJ need not discuss every piece of evidence in the record, an ALJ may not selectively include only those portions of the medical evidence that places a claimant in a capable light, and fail to acknowledge evidence that potentially supports a finding of disability. Courts have not hesitated to remand under such circumstances. *See e.g., Gentry*, 741 F.3d at 724 (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper

---

[6] Notably, the ALJ decision does not discuss (1) the results of Davidson's abnormal QSART testing of her bilateral lower extremities; or (2) treatment notes from 2015 indicating continued complaints of bilateral hand pain, weakness, and paresthesias.

[7] In discussing Dr. Cooper's May 2014 opinion, the ALJ accorded it "some weight" but stated that "based on later submitted evidence (34F -50F), the undersigned has assessed greater exertional, postural, manipulative, and environmental limitations herein." (Tr. 179.) With regard to Dr. Sutherland's opinion, the ALJ stated that "some weight is accorded to the postural and environmental limitations at the initial level of review; however, based on a complete review of the record including exhibits added at the hearing level (26F-50F), the undersigned has assessed different postural, manipulative, and environmental limitations in the [RFC] assessed herein." (Tr. 179-180.) Aside from these conclusory statements, the ALJ does not provide any explanation or otherwise articulate how the "later submitted evidence" affected his review of the opinion evidence in this case.

analysis); *Germany–Johnson,* 313 Fed.Appx. at 777 (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Williams v. Colvin,* 2017 WL 1319781 at * 16 (N.D Ohio Feb. 1, 2017), *report and recommendation adopted by*, 2017 WL 1304475 (N.D. Ohio April 7, 2017); *Ackles v. Colvin,* 2015 WL 1757474 at * 6 (S.D. Ohio April 17, 2015), *report and recommendation adopted by*, 2015 WL 2142396 (S.D. Ohio May 6, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith,* 2013 WL 943874 at * 6 ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."); *Johnson v. Comm'r of Soc. Sec.*, 2016 WL 7208783 (S.D. Ohio Dec. 13, 2016), *report and recommendation adopted by,* 2017 WL 375707 (S.D. Ohio Jan. 25, 2017) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes."); *Taylor v. Comm'r of Soc. Sec.*, 2014 WL 1874055 at * 4 (N.D. Ohio May 8, 2014) (stating it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., 'cherry-picking' it—to avoid analyzing all the relevant evidence. This is particularly so when the evidence ignored is from a treating physician.)

Accordingly, and for all the reasons set forth above, the Court finds the physical limitations in the RFC are not supported by substantial evidence. It is therefore recommended that this matter be remanded for a more complete consideration of the evidence regarding Davidson's chronic neck, back, and hand pain in determining the RFC.

***Sentence Six Remand***

In her second assignment of error, Davidson argues new, material evidence submitted to the Appeals Council warrants a remand under sentence six. (Doc. No. 13 at 15.) Specifically, Davidson cites medical records showing she underwent a left carpal tunnel release surgery in October 2015 (one month subsequent to the ALJ decision) and argues "if the ALJ had known that her left hand was equally impaired and warranted surgical intervention, it is highly probable that the ALJ would have reached a more restrictive residual functional capacity assessment and found Ms. Davidson disabled." (*Id*. at 16) (citing Tr. 106, 118.)

The Commissioner argues a sentence six remand is not warranted because Davidson cannot demonstrate good cause for failing to obtain and present this evidence to the ALJ prior to the issuance of the decision. (Doc. No. 15 at 12.) She also maintains the evidence cited by Davidson is not "material" because "the possibility that her condition 'worsened' after the ALJ's decision is no moment." (*Id*. at 13.) Finally, the Commissioner argues the allegedly new evidence is not relevant because it post-dates the ALJ decision and, therefore, was not reflective of her condition during the relevant period.

The Sixth Circuit has repeatedly held that "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a claimant shows the evidence satisfies the standard set forth in sentence six of 42 U.S.C. § 405(g). *Id. See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996); *Lee v. Comm'r of Soc. Sec.*, 529 Fed. Appx. 706, 717 (6th Cir. July 9, 2013) (stating that "we view newly submitted evidence only to determine whether it meets the requirements for sentence-six

remand"). Sentence Six provides that:

> The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g) (emphasis added).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' " *Foster*, 279 F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626). Evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" *Id*. (quoting *Sizemore v. Sec'y of Health & Human Servs*., 865 F.2d 709, 711 (6th Cir.1988)). *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir.2007) (noting that evidence is "material" if it "would likely change the Commissioner's decision."); *Courter v. Comm'r of Soc. Sec*., 2012 WL 1592750 at * 11 (6th Cir. May 7, 2012) (same). Evidence is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition after the administrative hearing. *See Prater v. Comm'r of Soc. Sec*.,---- F. Supp.3d ----, 2017 WL 588496 at * 2 (N.D. Ohio Feb. 14, 2017). *See also Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 478 (6th Cir.2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition"); *Deloge v. Comm'r of Soc. Sec*., 2013 WL

5613751 at * 3 (6th Cir. Oct.15, 2013) (same).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter*, 2012 WL 1592750 at * 11. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the clamant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id*. (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)). This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 2012 WL 1592750 at * 11. *See also Bass*, 499 F.3d at 513.

Because the undersigned has recommended this matter be remanded under sentence four for further consideration of the evidence regarding Davidson's chronic neck, back, and hand pain  in fashioning the RFC, the Court need not reach this issue. However, it is further recommended that, on remand, ALJ should consider the records submitted by Davidson to the Appeals Council regarding her treatment for left hand carpal tunnel syndrome and release surgery, as well as any other pertinent records, in making his decision about whether Davidson retains the capacity to perform the physical functions currently set forth in the RFC.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further consideration consistent with this decision.

*s/ Jonathan Greenberg*
                                        Jonathan D. Greenberg
                                        United States Magistrate Judge

Date: August 28, 2017

## OBJECTIONS

      **Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters***, 638 F.2d 947 (6th Cir. 1981);** *Thomas v. Arn***, 474 U.S. 140 (1985),** *reh'g denied***, 474 U.S. 1111 (1986).**